# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

UNITED STATES OF AMERICA,　　　　　:

　　　　　Plaintiff,　　　　　:　　　**Case No. 2:06-cr-268**

　　v.　　　　　:　　　**Judge Holschuh**

DANIEL B. TATMAN,　　　　　:

　　　　　Defendant.　　　　　:

　　　　　　　　　　:

## MEMORANDUM OPINION & ORDER

This matter is before the Court on Defendant's motion to suppress evidence uncovered in four separate searches of his home. (Doc. 19.) An evidentiary hearing took place over three days, on March 8, 2007, March 9, 2007 and August 20, 2007. After the transcripts were prepared, the parties then submitted post-hearing briefs. The matter is now ripe for adjudication. For the following reasons, the motion to suppress will be granted.

## I.　　Factual Background

### A.　　The Domestic Violence Call

Daniel and Taresa Tatman were married for the first time in September of 1983. (March 9, 2007 Hr'g Tr. at 95.) They bought the land at 401 Tabernacle Road in Ross County, Ohio in 1996 and started building a home there. (Id.) In April 1999, the Tatmans were divorced, and all property interest in 401 Tabernacle Road went to Mr. Tatman. (Id. at 95-96.) The Tatmans were subsequently remarried in April 2002. However, in December 2005, they again separated and Ms. Tatman left to live with Defendant's cousin, Rob Fletcher. According to Defendant, she took all of her belongings with her. (Id. at 96-98.) At the time of the hearings on the motion to

suppress, the Tatman's second divorce was still pending.

According to Defendant, in the early morning hours of Saturday, February 4, 2006, Ms. Tatman arrived at 401 Tabernacle Road, allegedly intoxicated. First, she falsely accused him of having another woman in the house. She then demanded possession of the house. Ms. Tatman implied that unless he left the house immediately, she would inform the police that he possessed illegal weapons. Defendant agreed to leave but said that he needed time to get his things together. He promised to leave the next day. Apparently unsatisfied with his answer, Ms. Tatman stated that she was going to call the police. In response, Defendant ripped the phone from the wall, grabbed Ms. Tatman by the shoulder and jacket and escorted her out of the house. He again told her that he would be gone by morning. Defendant locked the door behind him,[1] went upstairs to pack some things and returned to bed. (Id. at 100-03.)

At approximately 2:30 a.m. on February 4, 2006, Ross County Sheriff's Deputy Christopher Clark was dispatched to tend to the alleged victim of a domestic violence dispute. (March 8, 2007 Hr'g Tr. at 18.) The police dispatcher instructed Deputy Clark to meet the alleged female victim, Taresa Tatman, at the Massieville General Store. (Id.) Ms. Tatman, accompanied by Mr. Fletcher, identified herself to Deputy Clark and falsely stated that she resided at 401 Tabernacle Road in Chillicothe, Ohio. (Id. at 25, 30.) She told Deputy Clark that her husband, Daniel Tatman, had "grabbed her by the neck," "pulled her hair," and "pushed her out of her house." (Id. at 21.) Deputy Clark took photographs of Ms. Tatman's alleged injuries

---

[2] Defendant testified that he typically never locked the door to his residence because he lived in a remote area. (March 9, 2007 Hr'g Tr. at 100.) Because the door was never locked, he specifically remembers locking the door after Ms. Tatman left the house that night. To his knowledge, she did not possess a key. (Id. at 102.)

and asked for a written statement.  Ms. Tatman wrote, in relevant part:

> I came home from dropping the kids off, Uriah and Elijah Tatman, at a friend's house.  When I came in, Daniel grabbed me by the hair and threw me out after tearing the phone out to keep me from calling for help.  Yes, I want to press charges against him. *** Daniel Tatman is my husband."

(Id. at 25-26.)  The statement also indicated that Ms. Tatman resided at 401 Tabernacle Road.

In accordance with a Ross County Sheriff's Department policy that at least two cruisers be dispatched to a domestic violence call, Lieutenant Roger Hyden met Deputy Clark at the General Store.  After taking Ms. Tatman's statement, they drove to 401 Tabernacle Road in separate vehicles.  Ms. Tatman did not accompany the officers on this visit.  Once they arrived at the house, both officers approached the door, knocked and announced their presence, but there was no answer.  (Id. at 28-29.)  The officers then returned to the General Store and informed Ms. Tatman that Defendant must have fled the scene.  They told her that they planned to obtain a warrant for his arrest for domestic violence.  (Id.)

Ms. Tatman told Deputy Clark that Defendant was probably hiding in the house.  She stated that she did not feel safe because of the evening's earlier events and wanted him arrested.  (Id.)  Ms. Tatman told Deputy Clark that she had a house key and would let the officers into the house to arrest him.  (Id.)  Deputy Clark, Lieutenant Hyden, Ms. Tatman, and Rob Fletcher then returned to 401 Tabernacle Road.  (Id. at 29-30.)

### B.      The First Search

At the evidentiary hearing, witnesses gave varying accounts of what happened once they all arrived back at the house.  However, the following facts are undisputed.  Deputy Clark shone his flashlight through the front door and announced his presence.  After gaining entry into the house, Deputy Clark asked Defendant whether he had thrown Ms. Tatman out of the house.

Defendant admitted that he had grabbed her and physically forced her out the door. Ms. Tatman, who was standing outside, then yelled into the house that he should have left earlier and that she'd "tell." When Deputy Clark asked her what she was talking about, she told him that Defendant had fully automatic weapons in the house. Deputy Clark walked upstairs and discovered three weapons laying on a blanket on the floor. Through a preliminary examination of the guns, he determined that they were likely illegal automatic weapons. At that point, he arrested Defendant for domestic violence, handcuffed him and took him to the police cruiser.

### C.       The Second Search

After Defendant was in the police cruiser, Deputy Clark called a supervisor to see if he needed a search warrant before searching for more weapons. He was told that as long as he had the written consent of someone who lived there, no search warrant was needed. Taresa Tatman signed a Voluntary Consent to Search form, and then walked through the house with Deputy Clark, pointing out places where additional firearms might be hidden. Deputy Clark found 32 weapons, approximately 11 of which were illegal fully automatic weapons. At least one of the weapons had been reported stolen.

### D.       The Third Search

Two days later, on February 6, 2006, Detective David Bower of the Ross County Sheriff's Office submitted an affidavit in support of his request for a search warrant. That affidavit stated that while Deputy Clark was on the scene investigating the domestic violence complaint, the victim told him "that the suspect was in possession of fully automatic firearms. The victim gave consent and a search was conducted for the alleged firearms." (Gov't Ex. 5).

Judge Thomas Bunch of the Chillicothe Municipal Court signed the search warrant authorizing a search of all structures located on Defendant's property at 401 Tabernacle Road. The search was executed that same day by detectives from the Ross County Sheriff's Department and agents from the Bureau of Alcohol, Tobacco and Firearms ("ATF"). During this third search, the officers discovered, among other things, a Russian-type rifle that was suspected to be fully-automatic (it was later determined to be so), suppressors/silencers (some of which allegedly lacked serial numbers), bodies of suppressors and equipment for making suppressors. (March 8, 2007 Hr'g Tr. at 237-38.)

### E. The Fourth Search

On October 5, 2006, ATF Agent Scott O'Brien asked Defendant to meet him at a local horse racing track. (March 9, 2007 Hr'g Tr. at 32-33.) Defendant obliged, and when he arrived Agent O'Brien presented him with an arrest warrant issued by this Court. (Id.) Agent O'Brien then transported Defendant to the ATF Columbus field office for questioning. (Id. at 33-35.) Agent O'Brien explained to Defendant that he wanted to search his residence again because he suspected that John Parsons, a Ross County fugitive, was hiding on his land. (Id. at 36). Agent O'Brien also indicated that they wanted to search for additional machine guns and marijuana plants. (Id. at 37, 39). Defendant consented to the search.

This fourth search revealed a "CZ 24/26 Parts Kit," or "trigger group."[2] This parts kit had been seized during one of the earlier searches, and later returned to Defendant by the Ross County Sheriff's Department, along with other weapons determined to be legal. Nevertheless,

_____

[2] According to Agent O'Brien, a "trigger group" or "parts kit" is parts and pieces such as springs, triggers, and pieces of metal that, when fully assembled, may constitute a "machine gun" as that term is defined by federal law. (March 9, 2007 Hr'g Tr. at 26.)

ATF agents re-seized this parts kit and, after further testing, ultimately determined it to be an illegal machine gun.

On December 12, 2006, Defendant was indicted on two counts of unlawful possession of a machine gun and one count of transporting, shipping, or receiving a firearm which has had its serial number removed, in violation of 18 U.S.C. §§ 922(k) and (o).  Defendant subsequently moved to suppress the evidence found in all four searches, arguing that it was obtained in violation of the Fourth Amendment.

**II.      Relevant Law**

The Fourth Amendment to the United States Constitution guarantees the right to be free from "unreasonable searches and seizures."  U.S. Const. amend. IV.  Searches and seizures conducted without warrants issued by a judge or magistrate are per se unreasonable unless a specifically established exception applies.  Katz v. United States, 389 U.S. 347, 357 (1967). Searches conducted without warrants have been held unlawful "notwithstanding facts unquestionably showing probable cause," Agnello v. United States, 269 U.S. 20, 33 (1925), because the Constitution requires "that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police."  Wong Sun v. United States, 371 U.S. 471, 481-82 (1963).

Because of the increased expectation of privacy in a person's home, a warrantless entry into someone's house is not permitted absent consent or exigent circumstances.  Payton v. New York, 445 U.S. 573, 576, 589-90 (1980); Griffin v. Wisconsin, 483 U.S. 868, 883 (1987).  The burden is on the government to demonstrate that an exception to the warrant requirement applies, and that burden is a heavy one.  Welsh v. Wisconsin, 466 U.S. 740, 750 (1984).

Generally, evidence obtained in violation of the Fourth Amendment is inadmissible at trial. See Mapp v. Ohio, 367 U.S. 643, 648 (1967). As the Supreme Court explained in Murray v. United States, 487 U.S. 533 (1988):

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint.

Id. at 536-537 (internal quotes and citations omitted). Such derivative evidence acquired as a consequence of an illegal search or seizure is inadmissible under the "fruit of the poisonous tree" doctrine. See Wong Sun, 371 U.S. at 485-86.

## III. Summary of Parties' Arguments

Defendant argues that Deputy Clark lacked probable cause to arrest him for domestic violence. He further argues that the warrantless entry into his house and the first and second searches were illegal because there was no valid consent and no exigent circumstances existed. He maintains that Ms. Tatman had no actual or apparent authority to consent to the entry or the searches. Citing Georgia v. Randolph, 547 U.S. 103 (2006), he also argues that his objection to Deputy Clark's presence in his house trumped Ms. Tatman's alleged consent. Defendant further argues that these cannot be considered searches incident to a lawful arrest, and that the weapons, which could not be seen from downstairs, were not in plain view.

As to the third search, Defendant alleges that the search warrant was tainted because it was legally insufficient and was based on an illegal search. Since the search warrant was based

on "fruit of the poisonous tree," Defendant maintains that the evidence uncovered as a result of that warrant must be suppressed.  As to the fourth search, he argues that the search exceeded the scope of his consent and that his consent was not voluntary.  He also argues that because the trigger group that was seized was not readily identifiable as contraband, the seizure was illegal.

The Government maintains that probable cause existed to arrest Tatman for domestic violence.  It further argues that Taresa Tatman had apparent authority to consent to Deputy Clark's entry into the home to arrest Defendant.  The Government denies that Defendant objected to Deputy Clark's presence, but argues that even if he did object, law enforcement was permitted to enter the home because the "domestic violence exception" set forth in Georgia v. Randolph applies.

As to the first search, the Government maintains that once Deputy Clark learned of the illegal weapons, exigent circumstances existed and he had a duty to go investigate.  The Government also argues that because Defendant was going to be arrested, Deputy Clark had the right to follow him upstairs.  As to the second search, the Government maintains that Ms. Tatman had apparent authority to consent to search the house for additional weapons.

The Government also argues that even if the first two searches were unconstitutional, the inevitable discovery exception to the exclusionary rule applies, rendering the weapons admissible.  According to the Government,  the weapons would have been discovered when the search warrant was executed two days later, on February 6, 2006.  The Government maintains that probable cause existed for the issuance of that warrant.  In the alternative, the Government argues that the good-faith exception of United States v. Leon, 468 U.S. 897 (1984), applies.  The Government maintains that the fourth search was valid because Defendant consented to it.

## IV.    Probable Cause to Arrest for Domestic Violence

Defendant first argues that Deputy Clark lacked probable cause to arrest him for domestic violence because there was no evidence that he caused physical harm to Ms. Tatman.  The Court disagrees.  Ohio Revised Code § 2929.25(A) makes it unlawful to "knowingly cause or attempt to cause physical harm to a family or household member."  The existence of probable cause depends on "whether, at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91 (1964).

In this case, Deputy Clark testified that Ms. Tatman told him that Defendant had "grabbed her by the neck," "pulled her hair," and "pushed her out of the house."  (March 8, 2007 Hr'g Tr. at 21.)  He took photographs of the red marks on her neck.  (Id. at 21, 100-101.)  In the Court's view, although these injuries may not have been serious, there was sufficient evidence of physical harm for Deputy Clark to believe that Defendant had committed a crime.  The Court therefore finds that Deputy Clark had probable cause to arrest him for domestic violence.

## V.    Illegal Entry into Home

Even though Deputy Clark had probable cause to arrest Defendant for domestic violence, he was not permitted to enter Defendant's home to effect that arrest without a warrant unless he had valid consent or exigent circumstances existed.  Payton, 445 U.S. at 576, 589-90.

### A.    Valid Consent

The prohibition against a warrantless entry into a person's home to effectuate an arrest or perform a search does not apply in situations where voluntary consent has been obtained either

from the individual who owns the property or from a third party who possessed common authority over the premises. <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 181 (1990). Neither does the prohibition apply in those situations where a law enforcement officer reasonably, though erroneously, believes that an individual is an owner-occupant of a residence and that "owner" consents to a search. <u>Id.</u> at 186. However, when one owner-occupant consents to a search, but another owner-occupant who is physically present voices an objection, law enforcement officers cannot conduct a warrantless search. <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006).

As noted earlier, there was conflicting testimony at the hearing concerning the circumstances surrounding Deputy Clark's entry into Defendant's home. In determining whether that initial entry was legal, the Court must resolve those factual disputes.

### 1. Defendant Did Not Consent to Entry

Deputy Clark testified that he approached the door of the residence with Lieutenant Hyden. Ms. Tatman stood five to ten feet behind them. (March 8, 2007 Hr'g Tr. at 32.) Deputy Clark knocked and announced his presence while shining his flashlight through the glass in the door. (<u>Id.</u>) He testified that he saw Defendant at the top of the stairs. Deputy Clark could not recall exactly how he gained entry. He did not remember whether Ms. Tatman unlocked the door. (<u>Id.</u> at 32-33.) He testified, however, that once the door was opened about six inches, Defendant appeared and opened the door the rest of the way, at which point Deputy Clark stepped inside to question him about the domestic violence complaint. (<u>Id.</u> at 118-19.)

When Rob Fletcher was interviewed by ATF Agent Scott O'Brien on November 15, 2006, Fletcher stated that Defendant came downstairs and opened the door for Deputy Clark.[3] (Gov't Ex. 6 at 2.)  Fletcher, however, later recanted this statement and said that he did not see who opened the door or how the deputies got inside.  (Jan. 9, 2007 Aff. ¶ 10; Gov't Ex. 6A).  Because he was "standing back out of the way," approximately 30-50 feet away from the house when Deputy Clark entered, (Gov't Ex. 6 at 1-2), it is unlikely that he had a clear view of what transpired.  Ms. Tatman has stated that she does not remember how entry was gained into the house or how the door was opened.  (Jan. 9, 2007 Aff. ¶ 12; Gov't Ex. 7B.)

Defendant testified that he woke up to someone yelling, "Ross County Sheriff."  He also noticed flashlight beams shining up the steps and into the hallway outside his upstairs bedroom. (March 9, 2007 Hr'g Tr. at 105.)  He got out of bed, walked out of his bedroom and looked down the steps.  At that point, the door was already open and Deputy Clark was "standing in the doorway."   (Id. at 111.)   Defendant testified as follows:

> Q.    Then who makes the next move, and where do they get to?
> A.    I asked him how he got in.  He said the door was open.  And I told him, I said, No, it was not open.  I'd just locked it.
> And he told me, he said, Well, she let me in.

(Id. at 112.)  Defendant then told them that she had no right to be there because she did not live there.  He recalls turning on the light switch at the top of the stairs to show Deputy Clark that Ms. Tatman had no possessions there.  (Id.)  Defendant testified that he then walked part way

---

[3]  Neither Taresa Tatman nor Rob Fletcher testified at the evidentiary hearing. Nevertheless, the parties stipulated that the Court could consider several statements they made to Special Agent Scott O'Brien as well as affidavits they signed in the presence of defense counsel James Kingsley on January 9, 2007.  (Doc. 41).

down the steps and sat down.  (Id. at 113.)  At that point, Deputy Clark was already standing in the foyer and Ms. Tatman was standing a couple of feet outside the door.  (Id. at 114.)  Defendant testified that he was "positive" that he did not open the door for them.  (Id. at 138.)

The Court finds that Defendant's testimony is more credible than Deputy Clark's.  Deputy Clark admitted that he could not clearly recall how he gained entry into the house.  Moreover, because he clearly believed that Ms. Tatman had the authority to let him into the house to arrest Defendant, it is understandable that Deputy Clark might have opened the door and stepped inside while announcing his presence.  For these reasons, the Court finds that Defendant did not consent to Deputy Clark's initial entry into his home.

## 2. Ms. Tatman Had No Actual Authority to Consent to Entry

It appears to be undisputed that Ms. Tatman had neither actual nor common authority to consent to a search of Defendant's residence.  When the couple divorced for the first time in 1999, Defendant was awarded the entire interest in the real property.  Although they subsequently remarried, Ms. Tatman did not have mutual use of the property at the time this incident occurred.  Ms. Tatman had moved in with Rob Fletcher in December 2005, and, according to Defendant, she took all of her belongings with her, except for a cast iron skillet.  (Id. at 97.)  Defendant further testified that Ms. Tatman was no longer receiving mail at the residence.[4]  (Id. at 99.)

In addition, Ms. Tatman did not possess her own key to Defendant's house.  On the night in question, she used her son Uriah's key to help Deputy Clark gain entry into Defendant's

---

[4]  During her October 18, 2006 interview with Special Agent Scott O'Brien, Ms. Tatman told him that her clothes were still at the house on the night in question and that she was still receiving mail there.  (Gov't Ex. 7 at 3-4).

home.  (Jan. 9, 2007 Aff. ¶ 10).  Based on these circumstances, the Court finds that Ms. Tatman had no actual or common authority to consent to Deputy Clark's entry into Defendant's home.

### 3.     Ms. Tatman Did Have Apparent Authority to Consent to Entry

Even though Ms. Tatman had no actual or common authority to consent to Deputy Clark's entry into Defendant's home, the Court finds that she did have apparent authority to do so.  If Deputy Clark reasonably, but mistakenly, believed that Ms. Tatman still lived at 401 Tabernacle, then her consent to enter the home would be valid.  Rodriguez, 497 U.S. at 186.

Deputy Clark testified that he never once doubted that Ms. Tatman lived at 401 Tabernacle Road with Defendant.  (March 8, 2007 Hr'g Tr. at 153.)  When he first arrived at the general store, Ms. Tatman told him that her husband had thrown her out of "her house."  (Id. at 21.)  Her written statement indicated that her address was 401 Tabernacle Road, and stated that when she "came home" from dropping her kids off at a friend's house, her husband grabbed her by the hair and neck and threw her out.  (Gov't Ex. 3.)  After Defendant failed to answer the door when the officers went to his house the first time, Ms. Tatman produced a key and said that she would let them in.  (March 8, 2007 Hr'g Tr. at 29.)  Deputy Clark testified that he presumed that she had the key because it was her house.  (Id. at 115.)

Defendant nevertheless maintains that Deputy Clark could not have reasonably believed that Ms. Tatman lived at 401 Tabernacle.  In Rodriguez, the Supreme Court held that an officer cannot rely solely on "an explicit assertion that the person lives there."  In addition, "the surrounding circumstances" must not be such that "a reasonable person would doubt its truth and not act upon it without further inquiry."  Rodriguez, 497 U.S. at 188.  The Court stated:

As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

Id. at 188-89.

Defendant argues that there were a number of factors that should have caused Deputy Clark to question the validity of Ms. Tatman's claim. Defendant notes that it was midnight, there were no children present, Ms. Tatman was with another adult male, she was not visibly upset and displayed no obvious injuries. He maintains that Deputy Clark should have asked her whether she had been drinking, whether she was still married and still lived at that house, and whether she still had possessions there. He further maintains that Deputy Clark should have questioned her about the nature of her relationship with Rob Fletcher.

Deputy Clark testified, however, on cross-examination that Ms. Tatman "made it completely, a hundred percent, clear that that was her home." (March 8, 2007 Hr'g Tr. at 151-52.) He further testified that he had no reason to believe that she had been drinking. (Id. at 152.) As to Rob Fletcher's presence, he testified that it was typical for a domestic assault victim to call a friend or relative for support. Deputy Clark stated that Fletcher could have been Ms. Tatman's brother -- "[i]t was really none of my business." (Id.)

In the Court's view, under the circumstances presented here, Deputy Clark reasonably relied on Ms. Tatman's statement that she lived at 401 Tabernacle with her husband. At the time Deputy Clark first entered Defendant's home, nothing about the facts of this case should have caused him to question the veracity of her statement. For these reasons, the Court concludes that Deputy Clark reasonably believed that Ms. Tatman had authority to consent to his entry.

#### 4. Defendant's Objection to the Presence of Deputy Clark and Ms. Tatman Trumps Ms. Tatman's Apparent Authority

Although Ms. Tatman had apparent authority to allow Deputy Clark to enter Defendant's house to arrest him, this does not necessarily end the inquiry into whether that entry was lawful. Just weeks after this incident occurred, the United States Supreme Court decided the case of Georgia v. Randolph, 547 U.S. 103 (2006). In Randolph, a wife informed a law enforcement officer about her husband's illegal drug use and volunteered to take the officer into the home to search for contraband. Prior to entering, the officer asked the husband for permission to search the residence. He refused. The officer subsequently asked the wife if she still consented to the search despite her husband's objection. She said she did. The officer then searched the house and discovered contraband. The husband moved to suppress the evidence, claiming that the search violated his Fourth Amendment rights.

The issue before the Supreme Court was whether the seizure of the contraband was lawful when one occupant granted consent to the search but a co-occupant, who was present at the scene, expressly refused to consent to the search. The Court explicitly held that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." Id. at 106.

Randolph involved an entry for the purpose of conducting a warrantless search of the residence for contraband. In contrast, Deputy Clark sought entry for the purpose of questioning Defendant about a claim of domestic violence and to possibly effectuate a warrantless arrest. This factual difference, however, does not detract from Randolph's underlying conclusion and applicability. If the objection of a physically-present co-occupant trumps another occupant's consent to search a residence for contraband, it follows that the objection of a physically-present

15

occupant trumps another alleged co-occupant's consent to enter a home to effectuate a warrantless arrest.

In the discussing the difference between government intrusion to effectuate a warrantless arrest and a warrantless search, the United States Supreme Court has stated:

> But the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind.  The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home.  The Fourth Amendment protects the individual's privacy in a variety of settings.  In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms: "the right of the people to be secure in their ... houses ... shall not be violated."  That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.

Riddick v. New York, 445 U.S. 573, 589 (1980) (internal citations omitted).

At the evidentiary hearing in this case, there was conflicting testimony concerning whether Defendant voiced any objections to Deputy Clark's entry into his home.  Defendant testified that he objected to Deputy Clark's presence from the moment Clark entered the house:

> Q. Then who makes the next move, and where do they get to?
> A. I asked him how he got in.  He said the door was open.  And I told him, I said, No, it was not open.  I'd just locked it.
> And he told me, he said, Well, she let me in.
> Q. All right.  What happened next?
> A. I told him that she had no right to let him in, she had no right to be there, she did not live there.
> Q. Now, you have an absolute recollection that you made those three statements to that officer?
> A. Yes.  I was very upset because I'd just throwed her out of the house.
> Q. Did you make any comment about his right to be there?
> A. I told that she had no right to let him in, they had no right to be there.
> Q. Now, after you said she had no right to be here, did you have some discussion with him about her having possessions there or not?
> A. Yeah.  I told him she did not live there.  And he said, She don't have no possessions here?

> I said, No, there is nothing here.
> I turned on the light, which had a light switch at the top of the stairway . . .
> and I said, She has no possessions here.. . .
> And he said, She don't have no clothes or anything here?
> And I said, No, she got all that.

(March 9, 2007 Hr'g Tr. at 111-13.)

Deputy Clark, however, testified that Defendant never objected to his presence in the

house:

> Q.    Do you recall him protesting her trying to come into the house?
> A.    No.
> Q.    Do you recall him protesting you coming into the house?
> A.    Nope.
> Q.    Did he ever say to you you don't have a right to be there?
> A.    No.
> Q.    Did he ever say to you to get out of the house?
> A.    No.
> Q.    All right.  Did he ever ask you to leave?
> A.    No.

(March 8, 2007 Hr'g Tr. at 39-40.)  On cross-examination, Deputy Clark testified as follows:

> Q.    Is it your testimony here, the best you can recollect, that there was no
>       conversation as the defendant was either standing on the stairs, coming
>       down the stairs, about she has no right to be here?  You don't recall him
>       saying that?
> A.    No.  The only time he said he didn't want her here is when he told me he
>       pushed her out because she had a boyfriend.
> Q.    "You have no right to be here," do you deny that statement was made?
> A.    No, he never told me that.  No.
> Q.    And she had no right to let you in.  You deny that statement being made?
> A.    That statement was not made.
> Q.    Now, in regards to it not being made, do you recall clearly that it was not
>       made, or you're just assuming it wasn't made and you don't really recall?
> A.    I know it wasn't made.

(Id. at 128-29.)

In instances such as this, involving completely contradictory testimony by two equally

credible witnesses, the Court must try to find some additional supportive evidence, whether

explicit or implicit, to lend credence to the recollection of one witness over the other. In the Court's view, Defendant's testimony is absolutely consistent with the undisputed fact that earlier in the evening he had a confrontation with his wife and physically removed her from his home and locked the door after she threatened to report his alleged possession of illegal weapons. It is reasonable to believe that Defendant would still be angry and would very likely object to her presence and to the presence of Deputy Clark standing in his doorway.

Defendant's testimony is also corroborated by statements made by Ms. Tatman and, to a lesser extent, by Rob Fletcher. On January 9, 2007, Taresa Tatman signed a sworn affidavit stating, "I did hear Daniel state to the Deputy that 'she has no right to be here'. He said, 'you have no right to be here'." (T. Tatman Aff. ¶ 15.)[5] On November 15, 2006, Rob Fletcher told Special Agent O'Brien, in an unsworn tape-recorded interview, that he did not hear Defendant tell Deputy Clark to get out of his house. (Gov't Ex. 6 at 3.) However, on January 9, 2007, Fletcher signed a sworn affidavit stating that when Deputy Clark entered the house, Fletcher "heard Daniel yell to them, 'You have no reason to be here. She has no reason to be here. This is my house. She don't live here.'" (Fletcher Aff. ¶ 11.) Moreover, Deputy Clark testified that it "could be possible" that Defendant made certain statements that he simply does not remember. (March 8, 2007 Hr'g Tr. at 188.)

Based on the evidence presented, the Court finds that Defendant did object to Deputy Clark's entry into his home. Pursuant to the holding in <u>Randolph</u>, Defendant's objection trumps Ms. Tatman's consent. Deputy Clark's initial entry into the home to arrest Defendant without a

---

[5] On October 18, 2006, Taresa Tatman told Special Agent O'Brien that she did not hear Defendant refuse to consent to a *search* of the residence, but she was not asked whether she heard Defendant object to her presence or the presence of Deputy Clark. (Gov't Ex. 7 at 8.)

warrant was, therefore, unlawful unless exigent circumstances existed.

## B. Exigent Circumstances

In his dissenting opinion in <u>Randolph</u>, Chief Justice Roberts expressed concern about the implications of applying the majority's holding in cases involving domestic violence. He noted that "[t]he majority's rule apparently forbids police from entering to assist with a domestic dispute if the abuser whose behavior prompted the request for police assistance objects." <u>Randolph</u>, 547 U.S. at 139 (Roberts, C.J., dissenting). In response to those concerns, the majority stated:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe that such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize in plain view or take further action supported by any consequent probable cause.) Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes. The undoubted right of the police to enter in order to protect a victim, however, has nothing to do with the question in this case, whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent.

<u>Id.</u> at 118 (internal citations and quotations omitted). In other words, <u>Randolph</u> does not affect the well-established rule that if exigent circumstances exist, the police may lawfully enter a residence without a warrant.

The Government argues that even if Deputy Clark did not have valid consent to enter Defendant's home, the "domestic violence exception" discussed in <u>Randolph</u> applies, making his entry a legal one. The Court disagrees. The "domestic violence exception" applies when it is

necessary for law enforcement officers to enter a home "to protect a resident from domestic violence." Id. at 118.  In this case, Taresa Tatman, the alleged victim, was in no immediate danger.  In fact, she was safely outside the house with two police officers.  Under these circumstances, no exigent circumstances exist and a warrantless entry is simply not justified.

A recent case from the Eastern District of California is instructive.  In Ohlsen v. County of San Joaquin, No. 2:06-cv-2361-GEB-GGH, 2008 WL 2331996 (E.D. Cal. June 4, 2008), the plaintiff challenged the police officers' warrantless entry into his home to arrest him for spousal abuse.  The county argued that the entry was justified by exigent circumstances.  Probable cause for the arrest existed.  Unbeknownst to plaintiff, an emergency protective order had been issued earlier that evening requiring him to move out immediately.  Plaintiff's wife, Jocelyn, wanted him arrested, but he refused to answer the door.  The court held that the protective order did not justify the warrantless entry and no exigent circumstances existed.  The court noted:

> However, when the officers entered Plaintiff's home, Jocelyn was outside with the officers, in relative safety, and the officers knew no one else was in the home with Plaintiff; thus, there is no evidence suggesting that delaying the entry in order to obtain a warrant would present danger to Jocelyn, the officers, or anyone else. See United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir.2005) (holding that exigent circumstances did not justify officer's warrantless entry into home where officer responded to domestic violence report and domestic violence victim was out front of the home).

Ohlsen, 2008 WL 2331996, at *2.  See also United States v. Donlin, 982 F.2d 31, 32 (1st Cir. 1992) (victimized individual outside her apartment when police arrived was, for all intents and purposes, within their protective custody); United States v. Davis, 290 F.3d 1239, 1242 (10th Cir. 2002) (noting that immediate harm was extinguished once husband ordered wife out of the home).

As in those cases, the victim in this case, Taresa Tatman, was not in any imminent danger. She was standing safely outside the house in the presence of two law enforcement officers. Moreover, at the time Deputy Clark entered the house, he did not know that there were any weapons inside the house. Nor was there any reason to believe that anyone other than Defendant was inside the house. Ms. Tatman had told Deputy Clark that she had dropped the kids off at a friend's house before the alleged physical confrontation. Therefore, as in Ohlsen, there is no evidence to suggest that delaying the entry in order to obtain a warrant would present any risk to Ms. Tatman, the officers, or anyone else. In short, even though the officers were at the house to investigate a complaint of domestic violence, there were no exigent circumstances to justify a warrantless entry.

Under the circumstances presented here, the Court concludes that Deputy Clark's entry into Defendant's home was unlawful. Defendant objected to Deputy Clark's presence, negating Ms. Tatman's consent. Moreover, no exigent circumstances justified Deputy Clark's warrantless entry into the house to investigate the domestic violence complaint or to arrest Defendant for domestic violence. Having found that Deputy Clark's initial entry into Defendant's home was unlawful, the Court turns to the question of whether the evidence subsequently discovered must be suppressed.

## VI.     First Search:  February 4, 2006

When Deputy Clark confronted Defendant with the allegations of domestic violence, Defendant admitted that he had thrown Ms. Tatman out of the house. (March 8, 2007 Hr'g Tr. at 36-37; March 9, 2007 Hr'g Tr. at 114). At the evidentiary hearing, Deputy Clark and Defendant gave conflicting testimony about what happened next.

According to Deputy Clark, Ms. Tatman, who was still standing outside, approximately five to ten feet from the door, yelled into the house:

> A.    [S]he said, Daniel, you should have just left.  You should have just left.  I told you, and I'll tell.
> And then I said, What will you tell about?
> And she said, Well, he has stuff people want.
> And I said, Like what? Drugs?
> You know.  I kind of started asking her, Drugs?  Weapons?  Explosives?  What?
> And she kind of looked.  I said, Weapons?
> And she shook her head to me.
> And I said, What?  Fully automatic?  What?  You know, just throwing things out.
> She said, Yeah, full auto.

(March 8, 2007 Hr'g Tr. at 38.)  Deputy Clark then allegedly asked Defendant whether he had weapons.  Defendant allegedly confirmed that he did.  (<u>Id.</u> at 40.)  Clark testified that he said to Defendant, "Let's take a look."  (<u>Id.</u> at 40-41.)  He then followed Defendant up the stairs.  In Defendant's bedroom, Deputy Clark observed at least three weapons in plain view on the floor, including two AR-15s.  Deputy Clark picked up one of the weapons.  He noticed a "threaded barrel" and observed a third selector switch position, which "is common for fully automatic."  Deputy Clark then arrested Defendant for domestic violence, placed handcuffs on him, and asked Lieutenant Hyden to escort Defendant to his cruiser.  (<u>Id.</u> at 42-43.)

Defendant recalls things differently.  He testified that when Ms. Tatman started yelling that she'd "tell," he assumed that she meant that she would tell about his illegal weapons.  (March 9, 2007 Hr'g Tr. at 114, 146.)  He told Deputy Clark:

> A.    If I need to go, I'll go.
> And then he said, That would be in your best interest.
> Q.    Then what happened?
> A.    I asked him about getting my stuff.  He said, Yeah, you can get your stuff.  He said, Just clothes.

> I went upstairs and started getting dressed. . .
>
> Q.  You do that unaccompanied?
> A.  Yes, She was outside, yelling, and he went outside with her. . .
> Q.  So, you're upstairs.  What happens next?
> A.  Well, I went upstairs.  I already had some guns laying out, because I started packing up earlier that night, because I was planning on leaving the next day.  I went upstairs, started getting my clothes gathered up, got my pants on, and he came up, picked up a gun, started looking at it, and cuffed me.

(Id. at 115-16.)

Defendant's testimony about going upstairs alone to get dressed is completely consistent with statements made by Ms. Tatman and Rob Fletcher.  (See Gov't Ex. 7 at 6; Gov't Ex. 7B; Gov't Ex. 6 at 4; Fletcher Aff. ¶ 14).  Based on this corroborating evidence and on the Court's assessment of the credibility of the witnesses at the evidentiary hearing, the Court finds that Deputy Clark permitted Defendant to go upstairs unaccompanied to get dressed.  Only after Ms. Tatman told Deputy Clark about the weapons did Deputy Clark go upstairs to investigate.

With this factual dispute now resolved, the next question is whether this initial search was lawful or whether the weapons that Deputy Clark discovered on the floor when he went upstairs must be excluded as evidence.  In the Court's view, Deputy Clark violated Defendant's Fourth Amendment rights by going upstairs without a warrant to search for the weapons.  Because the search was unlawful, the evidence seized in this first search is not admissible.

It is true that, in order to assure his or her safety and to safeguard evidence, a law enforcement officer may perform a search incident to a lawful arrest.  Virginia v. Moore, 128 S. Ct. 1598, 1607 (2008).  In this case, however, there was no lawful arrest.  It is undisputed that the domestic violence arrest occurred inside Defendant's home, and the Court has found that Deputy Clark's warrantless entry into the home was unlawful.  It follows that Deputy Clark's

trip upstairs to search for the weapons cannot be deemed a "search incident to a lawful arrest."

Citing <u>Washington v. Chrisman</u>, 455 U.S. 1 (1982), and <u>United States v. Harness</u>, 453 F.3d 752 (6th Cir.2006), the Government has also argued that because Defendant was being placed under arrest, Deputy Clark had the right to remain at his elbow and to follow him wherever he went inside the house, not only to ensure Deputy Clark's safety but also to ensure the integrity of the arrest. The Government then argues that because Deputy Clark had the right to follow Defendant upstairs and because the three weapons were laying on the blanket in "plain view," the search and seizure of these weapons was constitutional.

<u>Chrisman</u> and <u>Harness</u> are clearly distinguishable because they involved *lawful* arrests that took place *outside* the suspect's homes. When the suspects, who had already been arrested outside their homes, entered their homes to retrieve certain personal belongings, the officers followed them and discovered certain contraband in plain view. In the instant case, however, Defendant was arrested *inside* his house by an officer who had no right to be there.[6] Because Defendant's arrest occurred during an illegal warrantless entry, <u>Chrisman</u> and <u>Harness</u> are inapplicable.

<u>Chrisman</u> and <u>Harness</u> are also distinguishable because Deputy Clark's trip upstairs was not truly related to Defendant's arrest for domestic violence. He permitted Defendant to go upstairs by himself to get dressed. Clark did not accompany him in order to ensure his own safety or the integrity of the arrest. In fact, it appears that if Ms. Tatman had not told Deputy

---

[6] Moreover, because the weapons were not "discovered in a place where the officer has a right to be," the "plain view" exception to the warrant requirement is also inapplicable. <u>Chrisman</u>, 455 U.S. at 6.

Clark about the fully automatic weapons, Clark would have simply waited with her on the porch until Defendant came back downstairs, at which point Clark would have arrested him and taken him away. It was Ms. Tatman's accusation that Defendant had illegal weapons that prompted Deputy Clark to go upstairs to investigate her allegation. Under these circumstances, the holdings in <u>Chrisman</u> and <u>Harness</u> simply do not apply.

The Government further argues that, based upon Ms. Tatman's statement, Deputy Clark now had probable cause to believe that Defendant had committed an entirely separate crime, possession of illegal weapons. This may very well be true, but the mere existence of probable cause does not justify a warrantless search. Deputy Clark was not permitted to conduct a warrantless search of Defendant's house unless he had consent to search or exigent circumstances existed. Again, neither exception applies.

Deputy Clark admitted that he did not obtain Ms. Tatman's express consent before he went upstairs to search for the weapons. Rather, he testified that because she had permitted him to enter the house and then told him that there were weapons upstairs, he had her implied consent to go upstairs to look for them. (March 8, 2007 Hr'g Tr. at 145-48.) Based on the Court's previous finding that Defendant objected to Ms. Tatman's presence and told Deputy Clark that she did not live there, the Court finds that Deputy Clark could not have reasonably relied on Ms. Tatman's alleged implied consent to search.

Deputy Clark also admitted that he never asked Defendant for consent to search. He testified, however, that he believed that he had Defendant's implied consent to search because after Defendant admitted that he had weapons and Deputy Clark said, "Let's take a look," Defendant led him up the stairs. (<u>Id.</u> at 145-48, 167.) The Court, however, has found that this

portion of Deputy Clark's testimony was not credible. The Court has found that Deputy Clark permitted Defendant to go upstairs unaccompanied to get dressed. Ms. Tatman then told Deputy Clark about the weapons and, at that point, Deputy Clark went upstairs to investigate. The Court therefore concludes that Deputy Clark did not have valid consent to go upstairs to search for the weapons.

In the alternative, the Government contends that regardless of what happened up to that point, and regardless of whether Deputy Clark had consent to search, he had every right to go upstairs because once he learned of the fully automatic weapons, exigent circumstances justified the search. The Sixth Circuit has recognized four general categories of exigent circumstances: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir. 1996). In this case, the Government contends that Deputy Clark had the right to go upstairs to investigate because there was a risk of danger to the police or others.

The mere presence of firearms in a house does not, in and of itself, create an exigent circumstance justifying a warrantless search. There must also be some "impending threat to the police or to the public." See United States v. Morgan, 743 F.2d 1158, 1163 (6th Cir. 1984). As the Sixth Circuit said in United States v. Bates, 84 F.3d 790 (6th Cir. 1996):

> The presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent. Evidence that firearms are within a residence, by itself, is not sufficient to create an exigency to officers when executing a warrant. However, threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence.

Id. at 795 (emphasis added) (internal citations omitted).

In this case, although Ms. Tatman told Deputy Clark that Defendant had fully automatic weapons in the house, there is absolutely no evidence to support a finding that, at the time Deputy Clark went upstairs, Defendant was "likely to use a weapon or become violent." Deputy Clark testified that Ms. Tatman did not indicate that any weapons were involved in the domestic violence incident. Moreover, he saw no need to use additional caution as he approached the house. (March 8, 2007 Hr'g Tr. at 102.) When he first entered, he did not pat Defendant down for weapons, or ask if he had any. Deputy Clark testified, "I felt comfortable that nothing was in his hands and nothing posed an immediate danger." (Id. at 34, 36, 126-27.) Even after confronting Defendant with Ms. Tatman's allegations of domestic violence, Defendant remained calm. In fact, by the time Deputy Clark learned of the weapons and went upstairs, Lieutenant Hyden had already left the scene because Defendant was being so cooperative. (Id. at 41, 143.) The officers testified that Defendant was not violent, was not yelling, "wasn't causing any problems," and "was as cooperative as could be." (Id. at 41, 55, 77, 143, 211.) At that point, Deputy Clark had not seen any firearms in the house. (Id. at 136.) The fact that Deputy Clark allowed Defendant to go upstairs by himself to get dressed shows just how little risk Deputy Clark believed Defendant posed to anyone.

Nevertheless, Deputy Clark testified that once he learned that Defendant might have fully automatic weapons in the house, he needed to go upstairs to check it out. When asked why, he responded as follows:

> A. . . . First and foremost is, for my safety, I have the right to check adjacent rooms to make sure nobody else is in the house that's going to cause me harm. So, once I find out that there's a possibly fully automatic weapons, I'm going to go up and make sure nobody else is up there loading them, getting ready. Sons, you know, I'm taking their dad to jail. I'm going to make sure that it's safe for me.

(Id. at 145-46.) He testified that he had no reason to believe that Defendant was going to harm him. Nevertheless, he worried that someone else could have been hiding upstairs. (Id. at 149-51.)

Clearly, this thought had not crossed Deputy Clark's mind before then. In fact, up to that point, he had shown no concern for his safety. If he truly believed that other people were present in the house, he would have done a protective sweep of the house. Based on the fact that Ms. Tatman had told Deputy Clark that she had dropped the kids off at a friend's house prior to the domestic violence incident, it was unreasonable for him to believe that Defendant's children might be upstairs. Moreover, although Defendant testified that Ms. Tatman had accused him of having another woman in the house at some point within that past week, there is no evidence that Deputy Clark was aware of this. In fact, Clark testified that he did not know what they had been arguing about. (Id. at 154.) For these reasons, Deputy Clark's alleged newfound concern about other people hiding upstairs is simply not credible.[7]

Under these circumstances, there is no reason to believe that the mere presence of the weapons in the house posed such a risk to the officers or to anyone else that an immediate, warrantless search was necessary. The Court finds that the Government has failed to prove that exigent circumstances existed.

Moreover, Deputy Clark admitted that part of the reason he went upstairs was simply to *confirm* Ms. Tatman's statement that Defendant had fully automatic weapons. (Id. at 193.)

---

[7] Even if the Court gave credence to Deputy Clark's testimony that Defendant led him up the stairs to look at the weapons, the Court notes that there is no evidence that Deputy Clark took any precautions to protect himself from the "others" he allegedly suspected might be hiding upstairs. He did not wait for Lieutenant Hyden to return to back him up and he did not draw his gun as he proceeded up the stairs.

Deputy Clark testified that it was the practice of the Sheriff's Office to confiscate all weapons when responding to a complaint of domestic violence to protect the victim in case the aggressor gets out on bond.  The Sheriff's Office typically takes the weapons for safekeeping until the case is resolved.  (Id. at 41, 50.)  While this may well be a sound policy, its implementation is still subject to the confines of the Fourth Amendment.  In this case, because Deputy Clark did not obtain valid consent to search, and no exigent circumstances existed, the evidence discovered as a result of that illegal warrantless search must be suppressed.

## VII.    Second Search: February 4, 2006

After Defendant was handcuffed, Deputy Clark asked Lieutenant Hyden, who was summoned to return to the house after Clark learned of the weapons, to escort Defendant to the police cruiser.  Ms. Tatman then went into the house with Deputy Clark.  Deputy Clark asked her for written consent to search the house.  She complied with his request and signed the consent form. (March 8, 2007 Hr'g Tr. at 51-52, 195).   Deputy Clark testified that if she had not signed the consent form, he would have obtained a search warrant.  (Id. at 54.)

Deputy Clark also called a Ross County Sheriff's Department detective to ask whether Ms. Tatman's consent to search the house was sufficient or whether he should get a search warrant.  Clark was instructed that "as long as she lives there and as long as she's giving you consent, you're good to go." (Id. at 178.)  Deputy Clark then proceeded to search the residence and found 32 weapons, including a "belt-fed machine gun, 308s, 223s, Stens, tons of different weapons."  (Id. at 56-57.)

These weapons must be suppressed because: (1) Ms. Tatman's alleged consent to search was not voluntary; and (2) even if the alleged consent to search was voluntary, Ms. Tatman had

no authority to consent to the search.

When Ms. Tatman was interviewed by Agent O'Brien on October 18, 2006, she said that she signed the form out of fear that she could otherwise be implicated. (Gov't Ex. 7 at 7.) Ms. Tatman also indicated that she was concerned that she could lose her home. (Id.) Her First Amended Affidavit, which was executed under oath on January 9, 2007, states: "the young deputy presented me with a paper and told me it would be in my best interest to sign it because it would allow them to enter the residence and search it and would protect me from being involved and losing my home." (Jan. 9, 2007 Aff. ¶ 17.) Deputy Clark denies that he threatened her, but stated that it is possible that he may have told her that it would not hurt to cooperate. (March 8, 2007 Hr'g Tr. at 54, 196.)

In the Court's view, under the circumstances presented here, Ms. Tatman cannot be found to have voluntarily signed the consent form. She was separated from her husband and wanted to regain possession of the house for her children and herself. She was afraid that because she knew about the firearms, she could be implicated in the crime and might lose the house. Deputy Clark suggested that if she signed the consent form, it would serve to protect her from criminal prosecution and ensure that she did not lose her home. The obvious converse of this suggestion is that if she did not agree to sign the form, she would be criminally charged and would lose her home. Under these circumstances, the Court finds that Ms. Tatman did not give her voluntary consent to search.

Even if Ms. Tatman's alleged consent was voluntary, it was invalid because she had no authority to consent to the search. As discussed previously, she had no actual or common authority to consent. Although she had apparent authority to permit Deputy Clark to enter the

house to question Defendant about the domestic violence incident and to effectuate a possible arrest, that apparent authority evaporated the moment Defendant told Deputy Clark that Ms. Tatman no longer lived there. She therefore lacked apparent authority to consent to the search. Moreover, it is undisputed that Defendant did not consent to a search. He was already in the police cruiser when Deputy Clark asked Ms. Tatman for the consent to search.[8]

Nor can it be said that exigent circumstances existed. At that point, Defendant was already in the police cruiser and there was no possible risk of danger to the officers or anyone else. Absent valid consent or exigent circumstances, the warrantless search of Defendant's home was illegal and the weapons found during this second search must be excluded from evidence.

## VIII.  Third Search: February 6, 2006

### A.  Inevitable Discovery Doctrine

Invoking the "inevitable discovery" exception to the exclusionary rule, the Government argues that even if the first two searches are deemed unconstitutional, all of the weapons discovered during those two searches are admissible because the weapons would have been discovered when the search warrant was lawfully executed on February 6, 2008. The inevitable discovery doctrine permits the Government to introduce at trial unlawfully obtained evidence if it proves, by a preponderance of the evidence, that the evidence in question inevitably would have been discovered through other, lawful means. Nix v. Williams, 467 U.S. 431, 444 (1984). The Supreme Court has reasoned that "[i]f the prosecution can establish by a preponderance of

---

[8] The Court finds no evidence that Deputy Clark removed Defendant from the premises for the purpose of preventing him from objecting to the search. Since Randolph had not yet been decided, he had no motive for doing so. Deputy Clark testified that he placed Defendant in the police cruiser to prevent him from arguing with Ms. Tatman. (March 8, 2007 Hr'g Tr. at 42-43.)

the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." Id. The doctrine is designed to avoid "put[ting] the police in a worse position than they would have been in absent any error or violation." Id. at 443.

By its nature, the inevitable discovery doctrine requires a court to engage in a certain amount of speculation to determine what the government "inevitably" would have discovered absent the illegal conduct. This speculation, however, must be kept to a minimum, and courts must focus on "demonstrated historical facts capable of ready verification or impeachment." Id. at 444-45 n. 5.; United States v. Ford, 184 F.3d 566, 577 (6th Cir. 1999). The inevitable discovery doctrine "'requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" United States v. Leake, 95 F.3d 409, 412 (6th Cir. 1996) (quoting United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992)).

**B.     Probable Cause for Issuance of Search Warrant**

In this case, application of the inevitable discovery doctrine with respect to the first two searches clearly hinges on the validity of the search warrant. The validity of the search warrant also, of course, determines the admissibility of the additional contraband discovered when that warrant was executed.

The circumstances surrounding the issuance of that warrant are as follows. On February 6, 2006, two days after Defendant was arrested for domestic violence, Detective David Bower of the Ross County Sheriff's Office sought and obtained a search warrant from Chillicothe Municipal Court Judge Thomas Bunch. This enabled law enforcement officials to search

Defendant's property for additional weapons. Bower testified that because Deputy Clark's February 4, 2006 search was conducted in the middle of the night, it was unlikely that he located all of the guns. He also testified that Deputy Clark had not searched a shed that was located on the property. (March 8, 2007 Hr'g Tr. at 233-34, 241, 249.)

The affidavit that Detective Bower submitted in support of his request for a search warrant stated in relevant part:

> 2.     On February 4, 2005 [sic], the Ross County Sheriff's Office was summoned to 401 Tabernacle Rd. reference a complaint of Domestic Violence. The responding Deputy obtained information from the victim and an arrest was made stemming from the complaint.
> 3.     While at the scene, the Deputy was advised by the victim that the suspect was in possession of fully automatic firearms. The victim gave consent and a search was conducted for the alleged firearms.
> 4.     During this search a number of non-registered fully automatic weapons were discovered, these weapons where [sic] concealed in the attic of this residence. Also a number of other weapons were located throughout this residence.
> 5.     While checking the non-modified weapons it was discovered and confirmed that one weapon had been reported stolen from Clark County Ill [sic] in 1996. This weapon is described as being a Diawa .12 gauge shotgun. Confirmation of this stolen weapon was obtained from law enforcement from Ill [sic].

(Gov't Ex. 5.)

Judge Bunch issued the requested warrant, presumably based on the statements made in Bower's affidavit. During the third search, conducted pursuant to the warrant, law enforcement officials from the Ross County Sheriff's Office and the Bureau of Alcohol, Tobacco and Firearms discovered several other weapons, including a Russian rifle that was later determined to be fully automatic. (March 8, 2007 Hr'g Tr. at 237-38.)

Bower's affidavit is obviously tainted. It falsely implies that no searches were conducted until after Ms. Tatman gave her consent. The undisputed fact, however, is that Ms. Tatman was

<u>not</u> asked for consent to search until <u>after</u> Deputy Clark had conducted an initial search, seen the three firearms on the bedroom floor, arrested Defendant, and reported his discovery to the Sheriff's Department.  Not only did Bower's affidavit omit material facts concerning this initial warrantless search, and omit material facts concerning *when* Ms. Tatman consented to a search, but it also relied, in large part, on evidence that was obtained illegally.  When an affidavit is tainted, as this one clearly is, the Court must determine whether, absent these defects, sufficient probable cause exists for the issuance of the search warrant.  <u>United States v. Karo</u>, 468 U.S. 705, 719 (1984); <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978).

The Government contends that the first sentence of paragraph three of Bower's affidavit, which states, "[w]hile at the scene, the Deputy was advised by the victim that the suspect was in possession of fully automatic firearms," is completely untainted and that, standing alone, it establishes sufficient probable cause for the issuance of a search warrant.[9]  The Court disagrees.

Probable cause exists if, "given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  The Court must make the probable cause determination based on the "totality of the circumstances."  <u>Id.</u>  In <u>Gates</u>, the Supreme Court noted, "even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."  <u>Id.</u> at 234.

_____

[9]  The Government also contends that statements made by Rob Fletcher contributed to the establishment of probable cause.  However, Bower's affidavit is devoid of any mention of any such statements.

In this case, Ms. Tatman, an alleged victim of domestic violence, told Deputy Clark that Defendant, her alleged attacker, possessed illegal weapons. Ms. Tatman was clearly angry that Defendant had refused to leave the house earlier in the evening, and that he had thrown her out. Her vengeful motive for telling Deputy Clark about the weapons is clearly reflected in her statement -- "Daniel, you should have just left . . . I told you, and I'll tell." (March 8, 2007 Hr'g Tr. at 38.)

As the Court noted in <u>Gates</u>, her desire for revenge, standing alone, does not necessarily render her statement unreliable or insufficient to establish probable cause. The unpublished Sixth Circuit case of <u>United States v. Cooper</u>, No. 99-5633, 2001 WL 45484 (6th Cir. Jan. 10, 2001), is instructive in this regard. Sandra Cooper went to the FBI office in Memphis to report that she and her husband had a violent altercation the night before. She showed them a silencer that she found hidden in their home and told them that her husband kept three guns in the house. She told the officers where they could find the guns. The FBI agents questioned her at length. They also ran a criminal background check and found that her husband was a convicted felon. They then obtained Mrs. Cooper's permission to search the house. She agreed to lure her husband away from home to facilitate the search. Local law enforcement stopped him and detained him while the search was conducted. He was later charged with being a felon in possession of a firearm. His detention by local law enforcement was subsequently determined to be unlawful. He moved to suppress the evidence of the guns as the fruit of that unlawful detention.

The question in <u>Cooper</u> was whether, at the time of the detention, there was probable cause to arrest Mr. Cooper for being a felon in possession of a firearm. The Court acknowledged

that "Mrs. Cooper had a motive to lie as she was an angry wife who had just decided to end her rocky marriage." Id. at **5. Nevertheless, the Court noted that "Mrs. Cooper provided an explicit, detailed description of her husband's alleged criminal activities based on her own first-hand observations." Id. The Court concluded that because she had clearly demonstrated the basis of her knowledge, and because the FBI agents had verified that she lived at the house and that her husband was a convicted felon, her vengeful motive did not preclude a finding of probable cause. Id. at **5-6.

The Court, in Cooper, also cited to the case of United States v. Phillips, 727 F.2d 392 (5th Cir. 1984). In that case, Mrs. Phillips contacted federal law enforcement officials to tell them that her husband, Melvin, possessed a sawed-off shotgun. He had threatened her with it earlier that month and she had seen it as recently as three days earlier. An ATF agent checked to see if there was a gun registered in Melvin Phillips' name; he found no such registration. Based on Mrs. Phillips' affidavit and the affidavit of an ATF agent, a magistrate issued a search warrant for Phillips' apartment. The Fifth Circuit noted that "Mrs. Phillips' estrangement from her husband may have cast doubt on her trustworthiness for purposes of evaluating her affidavit." Id. at 398. The Court nevertheless found that, "in light of the 'totality of the circumstances,' there was a 'fair probability' that Mrs. Phillips' tip was true" because she had "described in explicit detail where her husband lived, her husband's prior criminal record, and she claimed that she had seen the defendant in possession of the illegal firearm." Id. at 399.

Like Mrs. Cooper and Mrs. Phillips, Ms. Tatman had a motive for retaliating against her husband. He had refused to comply with her demand to vacate the house immediately, and had physically assaulted her before throwing her out of the house. She told Deputy Clark about the

36

illegal weapons in order to punish her husband for his conduct earlier that evening.  There is no evidence to support a finding that she told Deputy Clark out of concern for her own safety or the safety of the officers.

In stark contrast to Cooper and Phillips, however, there is scant evidence to support a finding that Ms. Tatman was being truthful or to establish the basis of her alleged knowledge of the illegal weapons.  In short, there is nothing to offset the fact that she had a motive for retaliating against her husband and was lashing out at him because she was angry.  At the time of the initial search, Ms. Tatman had volunteered no detailed information about the guns or their location.  Nor had she stated when she had last seen any of the guns.  As this Court has previously found, Defendant told Deputy Clark that Ms. Tatman no longer lived there.  Certainly, this bears on the question of whether she had current first-hand knowledge that Defendant possessed illegal weapons.  Ms. Tatman had not accused Defendant of threatening her with a gun earlier that evening.  Moreover, Deputy Clark had no previous contact with Ms. Tatman and had no basis for evaluating the truthfulness of her unsworn statement that evening.  Nevertheless, he asked her no questions to corroborate her claim.  He did not ask her how many guns there were, what kind they were, where they were kept, or when she had last seen them.  Instead, he simply chose to walk up the stairs "to take a look."  (Mar. 8, 2007 Hr'g Tr. at 186.)  As this Court has previously found, this search was illegal.

For these reasons, the Court finds that Ms. Tatman's uncorroborated statement, standing alone, did not provide sufficient probable cause for the issuance of a search warrant.  Because the search warrant was not supported by probable cause, the inevitable discovery exception to the exclusionary rule is inapplicable.  The weapons discovered during the first two searches are

therefore inadmissible, as is any additional evidence discovered when that warrant was executed on February 6, 2006.

###    C.    Good Faith Exception

The Government argues that even if the third search was unconstitutional, the good faith exception introduced in United States v. Leon, 486 U.S. 897 (1984), applies to preclude suppression of the evidence.  In Leon, the Supreme Court held that even if a search warrant is technically deficient, or if the magistrate judge otherwise erred in determining that probable cause existed, the evidence discovered during the search is admissible if the police rely on it in good faith.

The Leon case, however, has no application to a case like this one where the fault lies not with the issuing magistrate, but with the officer who submitted the warrant affidavit.  The Sixth Circuit has held that the good faith exception does not apply "where a warrant was secured in part on the basis of an illegal search or seizure."  United States v. Davis, 430 F.3d 345, 358 n.4 (6th Cir. 2005).  When the warrant affidavit is "tainted with evidence obtained as a result of a prior, warrantless, presumptively unlawful entry into a personal dwelling," the evidence must be excluded "to promote the ends of the Fourth Amendment."  United States v. Meixner, 128 F. Supp. 2d 1070, 1078 (E.D. Mich. 2001).  See also United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir. 1996) (holding that the good faith exception to the exclusionary rule does not apply when officers present the issuing judge with fruit of a potentially illegal pre-warrant search, but fail to disclose the details of that search); United States v. Bishop, 264 F.3d 919, 924 n.2 (9th Cir. 2001) ("When the warrant was secured in part on the basis of unlawfully seized evidence, the good-faith defense does not apply."); United States v. McGough, 412 F.3d 1232, 1240 (11th

Cir.2005).

In the present case, Detective Bower's warrant affidavit was tainted with evidence obtained as a result of two prior, warrantless, presumptively unlawful searches. Moreover, as discussed earlier, the warrant likely misled Judge Bunch to believe that no searches were conducted prior to obtaining Ms. Tatman's written consent. Because the search warrant was secured, at least in part, on the basis of unlawfully obtained evidence, the good-faith exception set forth in Leon does not apply.

## IX.    Fourth Search: October 5, 2006

The fourth search of Defendant's home occurred on October 5, 2006, following a meeting with ATF Agent Scott O'Brien. On that date, Defendant signed a "consent to search" form. (Gov't Ex. 2.) As noted earlier, during this consent search, ATF agents seized a "CZ 24/26 Parts Kit," or "trigger group," that had previously been returned to Defendant by the Ross County Sheriff's Department, along with other weapons that the Department had determined were not contraband. The trigger group was not readily identifiable as a machine gun. Only after Agent O'Brien sent photographs of the gun parts to the firearms technology branch did the experts determine that the trigger group was capable of being converted into a machine gun. (Id.; March 8, 2007 Hr'g Tr. at 41-42).

The Government argues that because it obtained Defendant's valid, written consent to search for machine guns, the trigger group discovered during this search is admissible. Defendant, however, argues that the search exceeded the scope of his consent.

The Supreme Court has held that "[t]he scope of a search is generally defined by its expressed object." Florida v. Jimeno, 500 U.S. 248, 251 (1991). Moreover, "[t]he standard for

measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id.

In this case, the expressed object of the search clearly centered on escaped fugitive John Parsons, who had allegedly killed a law enforcement officer, escaped from jail and was the subject of an extensive manhunt. The transcript of Defendant's interview with Agent O'Brien and Investigator Arledge indicates that the purpose of the interview was to discuss "stuff that's happening down in Ross County, Ohio." (Gov't Ex. 21A).

Of the fourteen pages of the interview transcript, virtually the entire transcript is devoted to questioning Defendant about John Parsons - whether Defendant or his girlfriend knew him; knew his whereabouts; had given him aid; knew of the $125,000 reward for his capture; whether Defendant's ex-wife knew him; and whether Defendant had any bunkers on his property where Parsons might hide. There is a fleeting reference to the existence of "marijuana fields, or anything like that," which Defendant denied. (Id. at p. 3).

The reference to weapons began with Agent O'Brien telling Defendant that, "the word out there is that . . . you might have . . . given him (Parsons) a weapon." (Id. at p. 1). Defendant denied this, telling Agent O'Brien that he had never met John Parsons. (Id. at pp. 1, 5). When Agent O'Brien asked Defendant if there were any other machine guns at his house, Defendant replied:

> DANIEL TATMAN: No. But uh, Ross County did give me a couple parts kits back.
> AGENT O'BRIEN: Some what?
> DANIEL TATMAN: Part kits.
> AGENT O'BRIEN: Any receivers, or any -? When did they give those back to you?

DANIEL TATMAN: Uh ... when they gave me the rest of my stuff.
AGENT O'BRIEN: Do you have all of your firearms back?
DANIEL TATMAN: Yea.
(pause)
DANIEL TATMAN: There's a lot of 'em (unintelligible)
AGENT O'BRIEN: Okay. So, they gave you back all those guns?
DANIEL TATMAN: Yea.
AGENT O'BRIEN: Okay. Alright. Uhm ... but no other machine guns, or ...
DANIEL TATMAN: ... No. I (unintelligible) machine guns (laughs). You know, I mean ...sh ... I'm done with her.
AGENT O'BRIEN: Right. Well, the word is, that you're making more machine guns there on the hill, so.
DANIEL TATMAN: No.
AGENT O'BRIEN: Okay.

*** 

AGENT O'BRIEN: Uhm ... (pause) Would there be ... so, there's no other machine guns in your house? Just semi-automatic ones that you got back from (unintelligible)...
DANIEL TATMAN: Yeah ... uh, I got one semi-automatic, that's it.
AGENT O'BRIEN: What about all your hand guns? And shot guns?
DANIEL TATMAN: They only took, they didn't take no hand guns. Well, yeah, a couple of pistols, there was my boy's 222 pistol, and uh ... 357 revolver ... and ...
AGENT O'BRIEN: Alright. Would you have a problem, if I went down to your house, to make sure there is no more machine guns and no evidence of you assisting John Parsons?
DANIEL TATMAN: My (unintelligible) and parts kits are there, that's it.
AGENT O'BRIEN: Okay. Alright. But you wouldn't have a problem if we went down there just to take, so I could eliminate you off the ... (unintelligible)
DANIEL TATMAN: Uhhh ... I have no connection on John Parsons.
AGENT O'BRIEN: No connection?
DANIEL TATMAN: And I have no machine guns.
AGENT O'BRIEN: Okay.
DANIEL TATMAN: Like I said, there is some parts kits there, that ...
AGENT O'BRIEN: parts kits a parts kit
DANIEL TATMAN: Yea.

(Id. at 5-6, 8.)

The expressed purpose of the proposed search was "to make sure there is no more

machine guns and no evidence of [Defendant] assisting John Parsons." (Id. at 8.) The relevant

41

question with respect to the appropriate scope of the search is what a reasonable person would have understood by this exchange.  See Jimeno, 500 U.S. at 251.  The Sixth Circuit has recently held that "when an officer receives consent, he is allowed to search only what is reasonably covered by the consent given."  United States v. Purcell, 526 F.3d 953, 962 (6th Cir. 2008).

In this case, Defendant denied knowing John Parsons and denied giving him any weapons.  When Agent O'Brien asked if there were "any *other* machine guns at your house, now?" (Gov't Ex. 21A at 5) (emphasis added), Defendant told him "No," but he told Agent O'Brien that the Ross County Sheriff's Department had returned to him all of the previously-seized weapons that it had determined were legal,  including one semi-automatic weapon and a parts kit.  (Id. at 5-6.)  Agent O'Brien again asked if Defendant had any "*other* machine guns," noting that there were rumors that Defendant was "making *more* machine guns up there on the hill." (Id. at 6) (emphasis added).  Moments later, Agent O'Brien again verbally verified that "there's no *other* machine guns at your house?"  (Id. at 8) (emphasis added).  When he finally asked for consent to search, he again limited his request to a search for "*more* machine guns." (Id.) (emphasis added).

In the Court's view, a reasonable person would interpret this request to include *only* those weapons and gun parts that had not already been seized during one of the earlier searches.  The seizure of the parts kit or trigger group, which had previously been seized and then returned to Defendant, therefore exceeded the scope of the search to which Defendant consented.  Because the search and seizure exceeded the scope of Defendant's consent, it was illegal, and the fruits of that search and seizure are inadmissible.

**X.**     **Conclusion**

For the reasons stated above, Defendant's motion to suppress evidence discovered during the searches that occurred on February 4, 2006, February 6, 2005, and October 5, 2006 (Doc. 19) is **GRANTED.**

The Court notes that, in that motion, Defendant had also moved to suppress certain statements he made on February 6, 2006.  The Government did not address this portion of the motion, but promised to do so "at the time of the suppression hearing."  (Govt's Response to Def.'s Mot. to Suppress at 30 n.8.)  The admissibility of these statements, however, was not discussed at the suppression hearing.  The Court also notes that the Government has failed to file any response to Defendant's motion to dismiss the indictment (Doc. 20).

To the extent the Government still intends to address either of these outstanding issues, it shall do within 21 days of the date of this Memorandum Opinion and Order.

<b>IT IS SO ORDERED.</b>


Date: December 31, 2008                              **/s/ John D. Holschuh**
                                                      John D. Holschuh, Judge
                                                      United States District Court